418 So.2d 322 (1982)
HOLIDAY CARE CENTER, Peninsular Fire Insurance Company and Corporate Group Service, Inc., Appellants,
v.
Mary SCRIVEN and Department of Labor and Employment Security, Appellees.
No. AH-167.
District Court of Appeal of Florida, First District.
August 2, 1982.
Rehearing Denied September 8, 1982.
*323 Joseph E. Smith of Miller & Cooper, Orlando, for appellants.
Edward H. Hurt of Hurt & Parrish, and Bill McCabe of Shepherd, McCabe & Cooley, Orlando, for appellees.
PER CURIAM.
By this appeal the self-insured employer complains of the deputy commissioner's order awarding claimant temporary total disability benefits amounting to less than $350, finding that the employer refused voluntary payment of those benefits in bad faith, and reserving jurisdiction to award an attorney's fee. The benefits awarded were to cover the 27-day period from March 10, 1981, when claimant's orthopedic doctor advised her that she might return to work, albeit with "some occasional back and leg pain," and April 6, 1981, when claimant found new employment, her old job having long since been filled after her injury in November 1980. At the March 10 office visit, the doctor instructed claimant to return on April 21 for another examination, which she did, and on June 12 the doctor found she had reached maximum medical improvement by full recovery without permanent disability. But as of March 10 previously, the self-insured employer, through its servicing agent, had unilaterally terminated temporary total disability benefits upon receiving the doctor's report of his examination and advice to claimant on that day.
*324 Thus we are concerned, before reaching the bad faith issue, with defining the employer's duty to continue paying benefits, previously paid over a period of months for an admitted temporary total disability due to a compensable accident, when the employer learns through the usual course of reporting that the treating physician has advised the injured worker, not yet at maximum medical improvement, to return to work. The question is this: When the injured worker has recovered the ability to work and is searching for work, but has not yet found gainful work, and is not yet at maximum medical improvement, is the worker entitled either to continue temporary total disability benefits as here ordered by the deputy, calculated as the designated percentage of the prior average weekly wage, section 440.15(2), Florida Statutes (1980 Supp.), or to temporary partial disability benefits calculated as another percentage of the difference between the prior average weekly wage and "the salary, wages, and other remuneration the employee is able to earn ..."? Sec. 440.15(4).
We hold that such a worker, being able to work, is not entitled to continuing temporary total disability benefits, but that she is entitled to temporary partial disability benefits during her conscientious search for work in the service of the former employer and elsewhere, until the employee reaches maximum medical improvement.
When this injured and disabled member of the labor force was medically advised on March 10, 1981, to return to work, and there was no other evidence that she could not then gainfully work, she was no longer totally disabled and unable, in any anatomic sense, to work. For that reason temporary total disability benefits were no longer payable. Forming Contractors v. Barry, 413 So.2d 132 (Fla. 1st DCA 1982); Sanford Nursing & Convalescent Center v. Lowery, 405 So.2d 280 (Fla. 1st DCA 1981); see also (applying pre-1979 law) Walter Glades Condominium v. Morris, 393 So.2d 664 (Fla. 1st DCA 1981); Cling Electric, Inc. v. Jones, 376 So.2d 481 (Fla. 1st DCA 1979). Thus the Court declared through Judge Shivers only recently:
[I]t was improper to have awarded TTD benefits from the date of the accident until such time as claimant reaches MMI. An injured claimant can be less than totally disabled without having reached MMI. (Citation omitted.) The capacity to return to work is the critical issue in determination of TTD. Thus, although claimant was TTD at the time of the award, he may regain, at least partially, his ability to return to work before he reaches MMI. Accordingly, we affirm the award of TTD benefits but amend the order to reflect that such benefits shall continue until claimant reaches MMI or is able to return to work. (Citations omitted; emphasis in original.)
Willard Kaufman Co. v. Rawlings, 414 So.2d 641 (Fla. 1st DCA 1982).
But it does not necessarily follow from this worker's recovery of physical ability to work that she also miraculously recovered, by virtue of the doctor's pronouncement, an immediate ability to earn from work the same "salary, wages, and other remuneration" she earlier lost by this industrial accident. At that point she was a worker without a job, still short of maximum medical improvement, still injured and recovering, and in that condition still partially disabled both physically and economically due to "personal injury ... by accident arising out of and in the course of employment." Sec. 440.02(6).
The work search is inextricably involved in the worker's entitlement to commensurate benefits for the continued disability thus defined; the search is involved also in the employer or carrier's obligation to pay those benefits; and it is involved in our recognition of that entitlement and obligation. To search for work conscientiously and effectively is the chapter 440 obligation of any injured and unemployed worker not physically disabled to work. That is the clear mandate of this Court's cited decisions refusing to excuse a worker's failure to search, or his inadequate search, due to subjective but medically unverifiable claims of inability to work or to *325 search. Yet just as the work search is the linchpin of any effort to return to gainful work from a condition disabling work, and is therefore the predicate for any claim based on continued disability to work as gainfully as before, in the case of one still recovering from an industrial injury the search for work must also be recognized as both (1) an economically significant consequence of the compensable injury and (2) an enterprise qualitatively affected by the residue of injury.
The first point is self-evident: simply being able to work and to search for work is not economically equivalent to new gainful employment. Thus the compensable injury continues temporarily to manifest itself, until maximum medical improvement, in a form of partial disability for which section 440.15(4)(a) requires commensurate compensation "based on actual wage loss." The second point is perhaps more problematic from an evidentiary standpoint: though it may be so, one cannot always hope to prove that, putting it in the terms of this case, the worker's "occasional back and leg pain" troubled her search. But that inference reasonably attends one who only just recovered the ability to work and is not yet as vigorous as she will be; and to deny that inference because we cannot measure it slices the human condition too abstractly and far too finely.
In Topeka Inn Management v. Pate, 414 So.2d 1184 (Fla. 1st DCA 1982), the Court ordered continuing wage loss benefits for permanent disability though "her wage loss during this period of time was not solely due to her compensable injury," and the wage loss was caused also by claimant's need to care for her ill husband. Here, in the same way and perhaps for stronger reasons pertinent to temporary benefits, see Sanford Nursing & Convalescent Center, supra, 405 So.2d at 282-83 (Ervin, J., dissenting), this worker's temporary wage loss, sustained while still recovering and searching satisfactorily for work to assuage that loss, is not any the less a consequence of her continuing injury because job scarcity contributed also. She was therefore entitled, beginning March 10, 1981, to commensurate benefits for temporary partial disability. Sec. 440.15(4).
Commensurate compensation for temporary partial disability to earn is as specified in section 440.15(4):
95 percent of the difference between 85 percent of the employee's average weekly wage and the salary, wages, and other remuneration the employee is able to earn, as compared on a weekly basis; however, the weekly wage-loss benefits shall not exceed an amount equal to 66 2/3 percent of the employee's average weekly wage at the time of injury.
One dollar factor in the formula, the worker's average weekly wage at the time of injury, is of course known; the other, the amount "the employee is able to earn," is zero at the beginning of the period of conscientious work search, here March 11, 1981. The latter factor will rise to a particular dollar amount if during the search, still before maximum medical improvement, the worker declines an employment opportunity at that particular rate of pay in order to continue seeking more gainful work or for other reasons. And if at any time the employer or carrier rightly perceives that the worker's search is not conscientious, the worker's entitlement to temporary partial disability compensation on this basis ceases.
The centrality of a work search to the issue at hand thus reappears with new force. The character and progress of the search is the employer's or carrier's business as well as the worker's. No longer will the employer or carrier abruptly terminate all benefits upon receiving a doctor's report releasing a still-healing worker to work. The obligation to pay benefits is transformed from total to partial benefits, as stated, but the obligation to pay benefits continues and, in the employer's or carrier's own interests, will be monitored by contact with the searching worker. The common incentive of both unemployed worker and employer/carrier to reestablish gainful employment serves the self-executing goals of chapter 440 and, in the employer and carrier, militates against the laissez-faire attitude *326 condemned by this Court in Florida Erection Services, Inc. v. McDonald, 395 So.2d 203, 211 (Fla. 1st DCA 1981). There the Court disapproved a carrier's "passive disapproval and rejection of claims on mere technical matters of form," and its "delay or denial of payment, without a showing of active effort and initiative ... to fairly and expeditiously determine its obligation to place needed benefits in the hands of the injured worker."
A carrier in active contact with a recovering but unemployed worker, monitoring the adequacy and progress of the work search, is a carrier indirectly assisting the search and abundantly serving the purposes for which chapter 440 exists. A former employer likewise serves who responds affirmatively and in its own interests to the worker's conscientious application for reemployment. And the recovering worker who looks for employment  ordinarily including the old employer in the work search  serves her interests both in reemployment and in displaying a conscientious search. Conversely, one who does not look for work she is physically able to perform risks not only the postponement of gainful employment but also her continuing entitlement to wage loss benefits during a conscientious search.
In this case the deputy found on substantial competent evidence that the worker conscientiously searched for work for 27 days after she was released to do so by her doctor and before finding gainful work. A longer period of searching would, quite obviously, present a more difficult problem for evaluation. The deputies will carefully evaluate those more difficult problems when they arise in cases of more extended search periods. The burden of proof remains on the claimant to prove, in respect to any benefits the employer or carrier refuses to pay, all elements of claimant's entitlement to wage loss benefits in the circumstances we have addressed. Sec. 440.15(4)(b). In this case the deputy's award of disability benefits was erroneous only in designating them total disability benefits; the amount, limited to 66 2/3 of claimant's average weekly wage, is correct. Jack Eckerd Corp. v. Coker, 411 So.2d 1026 (Fla. 1st DCA 1982).
That we here reach the same monetary result as if we had affirmed the deputy's award of continuing temporary total disability benefits is, we trust, neither sophistry nor necessarily a retreat from the firstcited decisions of this Court denying temporary total disability benefits when the unemployed claimant was able to work and could not find work, due apparently to the unavailability of work. E.g., Sanford Nursing & Convalescent Center, supra, 405 So.2d at 281. But see Fellows, Read & Weber v. Lance, 406 So.2d 1286 (Fla. 1st DCA 1981). We but recognize that there are significant doctrinal and practical differences between total disability and partial disability, chief among those being the ability to work; we recognize that the ability to work is not equivalent to reemployment especially in one whose job has been filled since her totally disabling injury on the job, and who has not yet achieved a maximum recovery; and subject to attentive monitoring of the work search, see Flesche v. Interstate Warehouse, 411 So.2d 919 (Fla. 1st DCA 1982), we place the economic burden of the recovery period where it belongs, on the employer and carrier.
We sustain also the deputy's finding that the employer's servicing agent acted in bad faith in abruptly terminating all benefits upon learning that this injured worker had been medically declared able to work though she had not yet reached maximum medical improvement. On substantial competent evidence the deputy found:
The issue of the claimant's attorney's entitlement to an attorney's fee based upon bad faith on the part of the employer/self-insured was also heard before the undersigned Deputy Commissioner. I find that the employer/self-insured had in fact acted in bad faith in the handling of this claimant's claim, in that they had terminated claimant's benefits as of March 11, 1981, and were aware when they took the claimant's deposition on June 3, 1981, that she had not returned to work until April 6, 1981, and continued *327 under the care and treatment of Dr. Stose, who had furnished the employer/self-insured with copies of his reports. I therefore find that the claimant's attorney is entitled to a reasonable attorney's fee for his services herein, to be paid by the employer/self-insured.
Knowing from the doctor's March 10 report that the worker was still under the doctor's care for "occasional back and leg pain" and was to return on April 21 for further medical care, knowing that the worker was then both unemployed and still to achieve maximum medical improvement, knowing when the doctor reported on April 21 that the worker was still experiencing pain as well as "minimal paravertebral muscle spasm," for which the doctor prescribed a drug, the employer terminated temporary total disability benefits and did nothing to assist the worker in initiating a claim for temporary partial disability benefits. The carrier was on notice during that period that, though total disability benefits were no longer due, the worker might be entitled to partial disability benefits. Compare Farm Stores v. Dyrda, 384 So.2d 269, 270 (Fla. 1st DCA 1980), in which we said:
[I]t is difficult to imagine that the carrier would not be on notice that the denial of claimed temporary total disability benefits might well result in an award of temporary partial where there is a gap between the cessation of temporary total disability and the date of maximum medical improvement.
In these circumstances the employer's duty was at the very minimum to provide the still healing and still unemployed worker with forms for use in furnishing information pertinent to possible temporary partial disability benefits. Fla. Admin. Code R. 38F-3.19. Later, on May 1, 1981, the worker through her attorney filed a claim for both temporary total disability benefits and "wage loss benefits," which further alerted the employer, who already should have known, that the worker was not immediately employed in her condition of less than maximum medical improvement. When the employer deposed claimant on June 3, 1981, the employer learned that the worker had gained reemployment on April 6. At that time the employer knew that its maximum exposure for the payment of continuing temporary disability benefits was something like $350. On principle the employer resisted paying those benefits and was ordered to pay them by the deputy.
Then on principle the employer further contested its $350 liability by appeal to this Court. Though we have found that the employer's liability was tagged by the deputy with the wrong label, the employer was liable in principle and in fact. When we consider the amount involved, the worker's continuing disability and unemployment during the 27 days in question, and the employer's cumulative and persistent stonewalling approach to its chapter 440 obligations, we cannot find the deputy erred in assessing an attorney's fee for having acted "in bad faith with regard to handling an injured worker's claim," resulting in an injured worker suffering economic loss. Sec. 440.34(3)(b), (5).
This Court has a responsibility, as do the deputies, to hold employers and carriers to the high standards imposed on them by chapter 440 as interpreted in Florida Erection Services, and we must therefore take account, on appeal as well as at the moment of the deputy's hearing and order, of "delay or denial of payment, without a showing of active effort and initiative ... to fairly and expeditiously determine [the employer's or carrier's] obligation to place needed benefits in the hands of the injured worker." Id., 395 So.2d at 211. This affirmative obligation does not terminate when the employer or carrier initially denies or terminates benefits, nor when the matter takes on adversarial characteristics, before the deputy, nor when the employer or carrier contemplates and prosecutes an appeal. The obligation continues, and the "delay or denial" of benefits during the several additional months necessary for an appeal becomes a factor in determining whether the appellant has fairly and expeditiously determined its obligation to place needed benefits in the hands of the injured *328 worker, or whether it has instead acted recklessly in handling the claim. That is the necessary effect of section 440.34(5), which is juxtaposed to the statutory criteria for awarding fees when "a carrier has acted in bad faith with regard to handling an injured worker's claim and the injured worker has suffered economic loss." Section 440.34(5) provides:
If any proceedings are had for review of any claim, award, or compensation order before any court, the court may allow or increase the attorney's fees, in its discretion, which shall be paid as the court may direct.
We acknowledge that it is difficult to establish a general rule applicable to all cases as to the length of delay that should be that issue can only be decided on a case-by-case basis, and the reasons for the delay must be closely scrutinized. We are nevertheless satisfied, however, on the record before us that there is competent and substantial evidence supporting the deputy's determination.
In accordance with section 440.34(5), we grant claimant's motion for an appellate attorney's fee, we assess the fee at $3,000 based on the documentation furnished after oral argument, and we direct that this fee, like the fee to be awarded by the deputy on remand, "not be recouped, directly or indirectly, by any carrier [or group self-insurer, section 440.02(7)] in the rate base, the premium or any rate filing." Sec. 440.34(3).
As modified to characterize the award as one for temporary partial disability wage loss benefits, the deputy's order is AFFIRMED.
ERVIN and SHAW, JJ., concur.
ROBERT P. SMITH, Jr., C.J., concurring and dissenting.
ROBERT P. SMITH, Jr., Chief Judge, concurring and dissenting.
I wholly agree with the Court that Scriven is entitled to temporary partial disability benefits, amounting to about $350, for the 27-day period in which she had neither attained maximum medical improvement nor secured employment despite a conscientious search. If I thought the record evidence supported the deputy's finding of carrier[*] bad faith in withholding initiatives required of it under chapter 440, I would also agree, for the reasons stated by the Court, that the deputy's award of attorney fees should be sustained under section 440.34(3)(b). In such a case, this Court should ordinarily add a further fee, not recoverable through the carrier's rate base, to give full deterrent effect to the deputy's assessment of a nonrecoverable fee for carrier bad faith in handling the claim. Alternatively an appellate fee, paid in the manner directed by the Court, is justified to deter carrier appeals that are wholly without merit. That is the case here, for the carrier's appeal on the $350 issue is but an inconsequential struggle over labels. I note, as does the Court, that section 440.34(5) does not require a finding of bad faith in a carrier's appeal as a predicate for awarding fees not recoverable through the rate base; to deter wholly groundless carrier appeals it is necessary that the Court employ this economic disincentive.
I regret that I cannot agree, however, that the record evidence supports the deputy's characterizations, and the Court's, of the carrier's conduct between March 10, 1981, and May 1, when Scriven's counsel filed this claim. The record is simply silent on what the carrier's representative did and did not do during that critical period. Adversary arguments based on little or no *329 evidence, other than a few scraps of medical paper in the file and the claimant's testimony on other subjects, is an unfortunate characteristic of much of the workers' compensation litigation that now pours unrelentingly into this Court. I would stem that flow by insisting that adversary lawyers produce evidence on which the deputy can decide the issues laid before them, so that we in turn can justifiably accord to the deputy's order the presumption of correctness that this "self-administered" compensation system especially deserves and requires.
NOTES
[*] From the manner in which counsel have presented this appeal we do not know whether Holiday Care Center is self-insured, assisted by a servicing agent, or is insured by Peninsular Fire Insurance Company. In any case the term "carrier" is all-encompassing, section 440.02(7)(a), though there is some difficulty in speaking of a self-insured as a "carrier" for purposes of section 440.34(3), which directs that attorney fees assessed for carrier bad faith "shall not be recouped, directly or indirectly, by any carrier in the rate base, premium, or any rate filing." Assessing such a fee against a self-insured has the same result, however: it is paid from profits.